In the Matter of HIGHPOINT ENTERPRISES, INC., Appellant, v BOARD OF ESTIMATE OF THE CITY OF NEW YORK et al., Respondents.—In a proceeding pursuant to CPLR article 78 to review a determination of the respondent Board of Estimate of the City of New York which set aside a determination of the Board of Standards and Appeals granting petitioner a permit to erect a microwave tower, the petitioner appeals from a judgment of the Supreme Court, Richmond County, entered June 27, 1978, which, *inter alia,* dismissed the petition. Judgment reversed, on the law, without costs or disbursements, petition granted, the determination of the Board of Estimate of the City of New York is annulled and the determination of the Board of Standards and Appeals is reinstated. This proceeding involves an application by petitioner, Highpoint Enterprises, Inc., for a special permit to allow the construction of a 180-foot radio tower on its property in a residential area of Todt Hill, Richmond County. The proposed radio tower would serve as an integral link in the congressionally authorized Vehicle Traffic System (VTS) of controlling ship movement in the general New York harbor area. The United States Coast Guard has primary responsibility for the design and implementation of the vehicle traffic control system. The Coast Guard contracted with the Motorola Corporation, which, in turn, contracted with the petitioner to construct the proposed tower on the latter's property. The tower would replace an existing radio tower about 87 feet high which was constructed on the petitioner's property pursuant to a special permit granted in 1967. In accordance with the general design requirements of the New York VTS, the proposed tower will broadcast VHF-FM and microwave radio transmissions. After an extensive review of the application, including public hearings and an inspection of the site, the New York City Board of Standards and Appeals found that: the site was presently developed with an accessory radio tower; the proposed tower would be an integral part of the sea traffic safety in New York harbor; the proposed tower complies with the most stringent international standards on microwave transmissions; installation would have no detrimental effect on the privacy, quiet, light and air in the surrounding area; and the advantages to be derived by the community and city outweigh the disadvantages of the proposed tower. Therefore, the application for the special permit was granted in accordance with section 73-30 of the New York City Zoning Resolution. Subsequently, the Board of Estimate of the City of New York accepted jurisdiction to review the above decision. Upon such review, the Board of Estimate disapproved the decision of the Board of Standards and Appeals. In doing so, the Board of Estimate found, *inter alia,* that the proposed tower represented a potential health hazard resulting from microwave transmissions and that there would be detrimental effects on the privacy, quiet and desirability of the immediate area. The petitioner commenced this article 78 proceeding to review the determination of the Board of Estimate. Assuming, without so finding, that the Board of Estimate was empowered by section 668 of the New York City Charter to review the actions of the Board of Standards and

Appeals relating to the issuance of a special permit, that scope of review is no greater than that provided for with respect to variances. Although the Board of Estimate may be a legislative body, the review of an application for a special permit is an administrative function (see *Mobil Oil Corp. v City of Syracuse,* 52 AD2d 731). As such, the Board of Estimate is limited to the traditional standard of substantial evidence in reviewing the grant or denial of a special permit. Reliance upon the maxim *expressio unius est exclusio alterius* to support the inference that subdivision c of section 668 of the New York City Charter grants a broader scope of review for the issuance of special permits than for the issuance of variances leads to an absurd result which is contrary to common law and common sense. In construing statutes, courts have an affirmative obligation to avoid such objectionable consequences (McKinney's Cons Laws of NY, Book 1, Statutes, §§ 141, 145). In general, a special permit pertains to a use which is authorized as long as certain conditions are satisfied. However, a variance represents a departure from the uses which are authorized by the zoning resolution. Whereas the issuance of a special permit "is a duty, imposed upon the zoning board once it is shown that the proposed use meets the standards prescribed by the ordinance", a variance will only be issued "upon unique circumstances and a showing of hardship" *(Matter of Knight v Bodkin,* 41 AD2d 413, 417). The Court of Appeals has distinguished special permits from variances as follows *(Matter of North Shore Steak House v Board of Appeals of Inc. Vil. of Thomaston,* 30 NY2d 238, 243-244): "The denial of the special exception permit, based on factual findings used to support denial of the variance, ignores the fundamental difference between a variance and a special exception permit. A variance is an authority to a property owner to use property in a manner forbidden by the ordinance while a special exception allows the property owner to put his property to a use expressly permitted by the ordinance. The inclusion of the permitted use in the ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood (2 Rathkopf, Law of Zoning and Planning, Ch 54, pp. 54-3—54-4; *Matter of Reed v. Board of Stds. & Appeals,* 255 N. Y. 126; *Matter of Syosset Holding Corp. v. Schlimm,* 4 A D 2d 766; *Matter of Bar Harbour Shopping Center v. Andrews,* 23 Misc 2d 894). Denial of the permit on the ground that the extension of the parking lot 25 feet into the residential zone is 'not * * * in harmony with the general purpose and intent of the zoning plan' is, thus, patently inconsistent. (See, generally, 3 Anderson, American Law of Zoning, § 15.13.) The burden of proof on an applicant for a special exception permit is much lighter than that required for a hardship variance *(Vernona v. West Cladwell,* 49 N. J. 274; Anderson, op. cit, *supra,* § 15.21)." A consequence of the dichotomy between variances and special permits is that there is generally a much greater and more stringent scope of review for variances (see *Matter of Reed v Board of Stds. & Appeals,* 255 NY 126). An applicant for a special use permit has a lighter burden than does an applicant for a variance and must only show compliance with the conditions imposed to minimize the anticipated impact of a legislatively authorized use on the surrounding area, whereas an applicant for a variance must justify a departure from the zoning resolution (see *Mobil Oil Corp. v City of Syracuse, supra).* Thus, it would be illogical to have a broader scope of review for the issuance of special permits. Nor is this result contrary to the charter. Subdivision c of section 668 of the charter does not provide that the standard of review for *variances* shall be substantial evidence. Rather, the applicable language is: "In the case of an application to *determine and vary*

*the zoning resolution,* review by the board of estimate shall be limited to an administrative determination as to whether the decision of the board of standards and appeals under each of the specific requirements of the zoning resolution was supported by substantial evidence before the board of standards and appeals." (Emphasis supplied.) Similarly, subdivision 6 of section 666 of the charter, in enunciating the jurisdiction of the Board of Standards and Appeals, includes the following: *"To determine and vary the application of the zoning resolution* as may be provided in such resolution and pursuant to section six hundred sixty-eight" (emphasis supplied). It is apparent that the phrase "determine and vary" is not limited to the grant of variances, but is a general reference to all applications of the zoning resolution, including special permits. This conclusion is supported by the balance of the language of section 668; that section is entitled "Variances and special permits" and the term variances is expressly used in other portions of the charter section. The use of the broader terminology "to determine and vary" necessarily refers to variances and special permits, as is similarly intended in the grant of jurisdiction to the Board of Standards and Appeals (New York City Charter, § 666, subd 6). Further support for the conclusion that the Board of Estimate is limited to a substantial evidence standard of review is found in the New York City Zoning Resolution. Article 7 of the resolution divides special permits into two categories. Chapter 3 refers to special permits which are granted by the Board of Standards and Appeals. Chapter 4 refers to special permits which are granted by the City Planning Commission with the express approval of the Board of Estimate. No mention of the Board of Estimate appears in chapter 3 and it is apparent that the power to issue those special permits authorized in chapter 3 has been delegated solely to the Board of Standards and Appeals. It is the special permits authorized in chapter 3 of the zoning resolution which are referred to in subdivision 6 of section 666 of the charter, which grants jurisdiction over applications to "determine and vary the application of the zoning resolution as may be provided in such resolution". The Board of Estimate plays a larger role only on those special permits which are granted in accordance with chapter 4 of the zoning resolution. The instant application was properly made under chapter 3 of the New York City Zoning Resolution. Thus, the scope of review employed by the Board of Estimate is limited to whether the determination by the Board of Standards and Appeals was supported by substantial evidence. Based upon that scope of review, we hold that there was substantial evidence to support the action of the Board of Standards and Appeals in granting the special permit and, accordingly, the determination of the Board of Estimate must be annulled and set aside. Contrary to the decision of the Board of Estimate, the evidence is unequivocal that the level of microwave transmissions which will be broadcast by the proposed tower presents absolutely no danger to the public's health and safety. The record also contains substantial evidence that in view of the existing tower, the new tower will have no significant detrimental effect, economically or aesthetically, on the surrounding community. Nor can the Board of Estimate's conclusion that there are preferable alternative sites and alternative methods of traffic control be sustained. The record before the Board of Estimate contained no significant evidence that was not before the Board of Standards and Appeals. The record before the Board of Standards and Appeals reveals that alternative sites were considered and rejected for valid reasons. The record before the Board of Standards and Appeals conclusively shows that the advantages of locating the proposed microwave tower at the Todt Hill site far outweigh the disadvantages to the

community. The record also establishes that there will be no significant detrimental impact on the privacy and quiet of the neighborhood as a result of the new tower. In view of the vital importance of the speedy implementation of the proposed VTS for the New York harbor, and the persuasive record in support of the Board of Standards and Appeals' determination to grant the special permit to construct the proposed tower at the Todt Hill site, it was improper for the Board of Estimate to ignore the substantial evidence in support of the application and disapprove the special permit. Damiani, J. P., Suozzi and Rabin, JJ., concur.

Titone, J., dissents and votes to affirm the judgment, with the following memorandum: In my opinion, the Board of Estimate, under section 668 of the New York City Charter, had jurisdiction to review the action of the Board of Standards and Appeals in this instance. The scope of its jurisdiction included the right to review the application of the petitioner *de novo* and its determination after a hearing rejecting the application had a rational basis in the record.

### JURISDICTION OF BOARD OF ESTIMATE

From the step-by-step procedure set forth in section 668 of the New York City Charter, as approved by the electorate of the City of New York in November, 1975, it is clear that the Board of Estimate has jurisdiction to review a decision of the Board of Standards and Appeals (hereinafter referred to as the Appeals Board) granting the issuance of a special permit as well as a variance. Subdivision a of section 668 vests in community and borough boards initially the right to review applications for a variance and a *special permit* under the zoning resolution. After such review, a community or borough board may file its recommendations with the Appeals Board. The latter then must conduct a public hearing and act on the application for a variance or a special permit (New York City Charter, § 668, subd b). After rendering its decision on the application, the Appeals Board must file the decision with the City Planning Commission as well as with the community or borough board involved. Within 30 days of an Appeals Board decision granting an application (for a variance or a special permit), an appeal may be taken to the Board of Estimate from such decision by the applicant, any other interested party or a local board (New York City Charter, § 668, subd c). In this case the community board, within 30 days, did interpose an appeal to the Board of Estimate from the Appeals Board determination granting the special permit. That such step-by-step procedure empowers the Board of Estimate to review a determination of the Appeals Board granting a special permit is buttressed by the following clarifying and implementing language contained in section 4.070 of the Uniform Land Use Procedure Guidelines promulgated by the City Planning Commission pursuant to subdivision g of section 197-c of the charter: "Within 30 days after a decision by the Board of Standards and Appeals concerning the granting of a variance of the Zoning Resolution or *a special permit,* a community board *may appeal such decision to the Board of Estimate.*" (Emphasis supplied.) Furthermore, judicial notice should be taken that after the electorate of the City of New York voted overwhelmingly in November, 1975 to adopt the new city charter, which included section 668, the State Charter Revision Commission, which drafted the document voted upon, prepared and promulgated a booklet in December, 1976 entitled A Charter Revision Guide for Community Board Members. Therein is found the following language by the draftsmen of the revised charter (p 5): "Zoning variances and *special permits* under the jurisdiction of the Board of Standards and Appeals have a different review procedure

which follows the regular land use procedure except as follows: 1. Applications for *them* are made to the Board of Standards and Appeals instead of the City Planning Department. * * * 3. Before acting, the Board of Standards and Appeals forwards the application to the affected Community Boards * * * 4. The local Boards act on *them* like other applications * * * 6. When all such reports [from the local boards] have been received * * * the Board of Standards and Appeals holds its own public hearing on the application * * * 8. Within 30 days after the decision, an affected Community or Borough Board (or any other interested party, including the City Planning Commission) may appeal the decision to the Board of Estimate" (emphasis and bracketed matter supplied). The City Planning Commission's procedures (§§ 4.070, 5.070) also state that a community board and/or a borough board, respectively, may appeal a decision by the Board of Standards and Appeals "concerning the granting of a variance of the Zoning Resolution or a *special permit* * * * to the Board of Estimate"* (emphasis supplied). Thus, from the language set forth in section 668 of the charter and the guidelines promulgated by both the City Planning Commission and by the State Charter Revision Commission which drafted the section in question, it is manifest that the Board of Estimate is vested with the power to entertain appeals from the Appeals Board's determinations granting special permits as well as variances.

### SCOPE OF REVIEW

Before delving further into the language employed in section 668 of the charter with respect to the Board of Estimate's scope of review of determinations by the Appeals Board granting applications for variances and special permits, and whether it varies in degree or is similar in both instances, I believe it is first necessary to discuss each category. The majority herein states that "that [the] scope of review [relating to the issuance of a special permit] is no greater than that provided for with respect to variances" (bracketed matter supplied). However, in coming to such a conclusion, the majority evidently has not taken into account the substantial differences between a special permit and a variance (see *Matter of Hartnett v Segur,* 21 AD2d 132). The law is settled that a special permit (also referred to as an exception or special exception), is treated as a legislative process or the exercise of a legislative function, while a variance is usually treated as an exercise of the judicial function whereby literal enforcement of the zoning ordinance may be disregarded. Exceptions or special permits are *allowable to serve the general good and welfare, rather than individual interests,* while a variance is a relaxation of the general rule of the ordinance to alleviate conditions peculiar to a particular property (101 CJS, Zoning, § 273). Special permit disputes are to be resolved by the commonsense judgments of representative citizens doing their best to make accommodations between conflicting community pressures *(Matter of Lemir Realty Corp. v Larkin,* 11 NY2d 20). While concededly the burden of proof on an applicant for a special permit is less than that required for a variance, it does not follow that an elected body such as the Board of Estimate must abdicate its responsibility to determine whether the issuance of such an instrument is in the best interest of those it was elected to serve. That the draftsmen of the revised charter were cognizant of such important distinctions is evident from the glossary found toward the end of the Charter Revision Guide. The Charter Revision Commission defined the terms "special permits" and "variance" as follows (p 29): *"Special Permits:* Zoning exceptions granted by either the City Planning Commission or the

Board of Standards and Appeals. *The benefit* must be *to the public-at-large and not exclusively to an individual or a corporation.* * * * *Variance:* Includes an exception to an area's zoning pattern, *generally granted to builders because of special hardships."* (Emphasis supplied.) Returning to a further analysis of section 668 of the charter, I find that under subdivision b, with respect to a variance, the Appeals Board is required to indicate "whether each of the specific requirements of the zoning resolution for the granting of variances has been met and shall include findings of fact with regard to each such requirement." The specific requirements alluded to for the granting of a variance are set forth in section 72-21 of the New York City Zoning Resolution and are also enumerated in the Charter Revision Guide (p 5): "1. That there are 'unique physical conditions' inherent in the parcel that would present 'practical difficulties' in complying strictly with the terms of the Resolution. 2. That because of these physical conditions the variance is necessary to enable the owner to realize a reasonable return from his property. 3. That the variance will not alter the 'essential character of the neighborhood.' 4. That the 'practical difficulties' claimed by the owner as a basis for the variance request are not self imposed * * * 5. The variance applied for is the minimum necessary to afford relief." Consistent with the above language, which does not encompass special permits but refers only to variances, subdivision c of section 668 of the charter provides: "In the case of an application to determine and *vary the zoning resolution, review by the board of estimate shall be limited to an administrative determination* as to whether the decision of the board of standards and appeals *under each of the specific requirements of the zoning resolution* was supported by substantial evidence" (emphasis supplied). Thus, from the above discussion and quoted provisions, it is clear that the language circumscribing the scope of the Board of Estimate's review pertains solely to the granting of a variance by the Appeals Board. It does not apply to the review of a granting of a special permit since (1) the five specific requirements under the zoning resolution that must be found by the Appeals Board before it may grant a variance to one alleging "practical difficulties" with respect to his parcel do not apply in the case of a special permit* and (2) in view of the fact that no such limiting language was employed in subdivision c of section 668 of the charter with respect to a review of the granting of a special permit, under the principle of *expressio unius est exclusio alterius,* it may be inferred that the elected and politically responsible members of the Board of Estimate have a much broader scope of review when a special permit application comes before it. Strong support for the argument that the above Latin principle applies in this instance is gleaned from the following language contained in the Charter Revision Commission's Guide (p 5): "9. If such an appeal is taken, the Board of Estimate has 30 days in which to decide whether to take jurisdiction and 30 days more in which to

---

* Pursuant to section 73-01 of the Zoning Resolution of the City of New York, before granting a special permit the Appeals Board must make findings geared toward the protection of the community rather than alleviating any hardship of the owner of specific property, as is the case in requests for variances. For instance, the Appeals Board must find that the conditions and safeguards imposed and the hazards or disadvantages to the community at large at the particular site are outweighed by the advantages to be *derived by the community* by the grant of such permit, etc. Significantly, subdivision c of section 668 of the charter does not contain language limiting the scope of the Board of Estimate's review with regard to such findings as is contained therein vis-à-vis the granting of a variance.

act. It may approve or disapprove the decision of the Board of Standards and Appeals, with an explanation in writing, *but in the case of a variance must limit its review to an administrative determination as to whether each of the specific Zoning Resolution requirements for granting a variance was supported by substantial evidence"* (emphasis supplied). Contrary to the view taken by the majority, I do not believe that it is "absurd" to take the position that the framers of the revised charter intended to give the elected Board of Estimate a broader scope of review in the issuance of special permits. What does border on the incredible is the majority's sloughing off or ignoring the clear intent evinced by those who drafted the revised charter in their guide, namely that the Board of Estimate's role in the issuance of a special permit, is greater than it is in the issuance of a variance. Where a legislative body is not precluded from considering factors not expressly set forth in the ordinance, the question of whether the permit should be issued is left to its untrammeled discretion so long as it is not exercised capriciously (cf. *Matter of 4M Club v Andrews,* 11 AD2d 720). It is also interesting to note that the majority states that the phrase "determine and vary the zoning resolution" contained in section 668 of the charter, "is a general reference to all applications of the zoning resolution, including special permits." What the majority is saying is that the grant of a special permit somehow "varies", or is in conflict with, the strict application of the zoning resolution, similar to the granting of a variance. Such position diametrically contradicts its earlier contention that "a variance represents a departure from the uses which are authorized by the zoning resolution", whereas, "a special permit refers to a use which is authorized as long as certain conditions are satisfied." Furthermore, attention should also be directed to subdivision 11 of section 666 of the New York City Charter, which clearly indicates that the Board of Estimate has more than a limited power of review over the Appeals Board with respect to the granting of a special permit. That subdivision confers jurisdiction in the Appeals Board "To issue such special permits under the zoning resolution *as are authorized* by the city planning commission *and the board of estimate"* (emphasis supplied). Thus, I am convinced that in drafting the proposed revision of the New York City Charter, the State Charter Revision Commission intended that the Board of Estimate should continue being "a major policy board for the City" (see Charter Revision Guide, p 28) and, correspondingly, *its* members, the Mayor, City Comptroller, City Council President and the five Borough Presidents, all elected officials, have broad discretion in matters under its jurisdiction directly bearing upon the health, safety and welfare of those residing in any of New York City's communities as well as the entire populace of such municipality. In the matter at bar, what is sought by the petitioner is not a minor exception to the zoning resolution indigenous to the subject property. Rather, by asking to substitute a 180-foot radio tower for one presently standing about 87 feet in height, petitioner seeks, *inter alia,* a radical change in the skyline of what is essentially a one- and two-family home community. A tower perched majestically atop a metropolitan skyscraper might well be deemed an "eyesore" had it been erected in a residential area. Aside from the issue of possible deleterious effects of cumulative microwave emissions from such a facility, and other important issues raised in this case, I submit that the height of the proposed tower alone is a question which the Board of Estimate, as a quasi-legislative and elected body charged with the ultimate responsibility for safeguarding the health, safety and welfare of the citizenry, had a right to consider *de novo* after it decided to review the granting of the special permit by the Appeals Board (see *Matter of Lemir Realty Corp. v Larkin,* 11 NY2d 20, *supra).*

DETERMINATION BY BOARD OF ESTIMATE REJECTING THE SPECIAL PERMIT
APPLICATION

I am aware that the grant or denial of a special permit by a legislative or quasi-legislative body, such as the Board of Estimate, is for court review purposes, administrative, and thus subject to review in a CPLR article 78 proceeding as to "reasonableness" (see *Matter of Lemir Realty Corp. v Larkin, supra,* p 24). As a corollary, where the power of approval of a special permit is retained or vested in a local legislative or quasi-legislative body, so long as its actions come within the scope of reasonableness, the courts may not interfere (see *Matter of Lemir Realty Corp. v Larkin, supra,* p 26). In the instant matter, the Board of Estimate concluded, after a hearing, *inter alia,* that the evidence presented disclosed no advantages inuring to the Todt Hill community and that it raised sufficient questions as to the safety of the proposed tower and the potential health hazard of the microwave emissions therefrom. It also pointed to the following factors, amongst others, as warranting a denial of the application: "The presence of a 180 foot tower in an area comprised of one- or two story private dwellings, potential interference with local radio or television reception" and "the infusion" of a commercial enterprise in a restrictive residential district. In my opinion, the Board of Estimate, based upon evidence appearing in the record, was justified in taking a cautious approach. Included in the record was a statement contained in the National Environmental Policy Act rules that radio facilities do emit nonelectromagnetic radiation and that sufficiently high concentrations can cause biological damage. Evidence was also submitted to the Board of Estimate that despite decades of extended use of microwave energy in both military and civilian fields, very little definitive information exists about the health effects of human exposure to microwaves. The petitioner's experts even admitted that "We have been aware of microwave radiation hazards since the fifties" and that there is a difference of opinion among scientists on the amount of radiation exposure that could be considered safe. Thus I am constrained to take issue with the majority's sweeping declaration that "the evidence is unequivocal that the level of microwave transmissions which will be broadcast by the proposed tower presents absolutely no danger to the public's health and safety." While it is true that scientific discoveries and modern technology have brought immeasurable benefits to our present society, it is also a matter of history that insufficient research and experimentation into potential aftereffects, have transformed many such "benefits" into what are at best considered mixed blessings. The advent of nuclear energy has left us ill prepared for the disposal of nuclear waste and has left multitudes exposed to the dangers of radioactive fallout. What were once beautiful and sparkling rivers are today little more than floating industrial garbage dumps (devoid of the life they once sustained in abundance). Many halls of learning constructed within the past two or three decades, containing certain insulating material used during construction, are today suspected in scientific circles as being cancer-causing halls of horror. In recent years thousands of automobiles and millions of automobile tires have been recalled for defects not detected either on the production line or before distribution. These are just a few glaring and sobering examples of what progress has wrought because of insufficient research, inadequate experimentation, and perhaps also a paucity of governmental inquiry and monitoring at the Federal, State and local levels. Hence, in view of the conflicting evidence in the record as to the effects of microwave emissions on the public, I am unwilling to join with the

majority in labeling as improper the cautious approach taken by the Board of Estimate. Furthermore, I am unpersuaded by the fact (brought to the court's attention by the petitioner) that this very same system of vessel traffic control is now in operation in other ports throughout the United States. The fact that special permits may have been granted to owners of other premises either in New York City, the State of New York, or elsewhere, does not in itself show that consent was arbitrarily refused to this applicant. Exercise of discretion in favor of one confers no right upon another to demand the same decision. In this instance the Board of Estimate may have simply refused to duplicate what it considered to be previous error. Conceivably, it may have even changed its views as to what is for the best interests of both the City of New York and the subject community (cf. *Matter of Lemir Realty Corp. v Larkin, supra,* p 25). Accordingly, I dissent and vote to affirm the judgment of Special Term.